# MARY WOODS v. WABASH RAILROAD COMPANY, Appellant.

### In Banc, April 25, 1905.

1. **NEGLIGENCE: What is Ordinary Care.** What constitutes ordinary care is to be determined by the circumstances of each particular case. The rule of admeasurement is, the greater the hazard the greater the care.

2. ———: ———: **Pedestrian on Track: School Girl.** It was the common custom of men, women and children to use the railroad track in walking to and from the schoolhouse, and plaintiff, a girl between fifteen and sixteen years old, on her way to school with her twin sister, fell in attempting to cross a cattle-guard; her foot became fastened, and she was run over by a train which was not in sight when she entered upon the track, and the testimony for her was that she had fallen before the train came into sight. *Held*, that it was plaintiff's own act that put her in peril, and her youth did not entirely exonerate her from the charge of negligence, though under the circumstances, her act could not be pronounced reckless.

3. ———: ———: ———: **Knowledge of Conductor.** Where the engineer knew that the track was used by school children at that hour of the day as a footpath, and saw plaintiff while his train was more than 1000 feet from her and her evidence shows that she had become fastened in a cattle-guard before the train came in sight, and that she was constantly rising and falling in an effort to extricate herself, the court will not say that there was no evidence upon which the jury could base a verdict for her.

4. ———: ———: ———: **Speculating on Trespasser's Movements.** It is not ordinary care for an engineer who sees girls running toward a place on the track which he knows to be dangerous, to deliberately let the train proceed at 40 or 45 miles an hour until he discovers that they are not going to be able to cross the dangerous place and then, after it is too late to stop the train before striking them, for the first time undertake to stop or slow up the train.

5. ———: ———: ———: **Falling in Cattle-Guard.** When the engineer of a fast train sees a pedestrain fall on a cattle-guard a short distance in front, it is his duty to immediately try to stop the train; especially, if, by doing so, he can avoid injuring her.

Woods v. Railroad.

6. ———: ———: ———: **Recovery Notwithstanding.** Plaintiff's negligence in being on the track may be conceded, and yet she is entitled to recover if the railroad's servants saw, or should have seen, her peril, and after becoming aware of it failed to avert the injury which they could have done with the means at hand if they had used ordinary care.

7. ———: ———: ———: **Continuing on Track.** But where the pedestrian on the track disregards the whistle of alarm given by the engineer and, instead of stepping off the track when she can do so, continues to run in front of the oncoming engine in an attempt to cross beyond the place of danger and in doing so her foot becomes fastened in the dangerous place at a time when the train is too close to be stopped before striking her, although those in charge do their best to stop it, the verdict should be for defendant.

8. ———: ———: ———: **Negligence Conceded: Other Acts.** Where plaintiff's negligence in being on the track is conceded, other questions of her negligence, such as failure to look for the coming of the train, or whether plaintiff, a girl fifteen years old, is responsible the same as older persons, do not enter into the case, and instructions setting forth those things should not be given, for, if plaintiff is not entitled to recover notwithstanding her negligence she is not entitled to recover at all.

9. ———: ———: ———: **Instructions.** An instruction which seeks to substitute as the standard of care that which in the best judgment of the engineer should have been done for that which a man of reasonable skill and experience and of ordinary care and prudence in his place would have done, should be refused.

10. ———: **Instructions: Bringing in New Points.** Instructions which seek to inject into the case points not in it, or which have no bearing on the issues, should not be given.

Appeal from Pike Circuit Court.—*Hon. D. H. Eby,* Judge.

AFFIRMED.

*George S. Grover* for appellant.

(1)   The demurrer to the evidence should have been sustained. Yancey v. Railroad, 93 Mo. 433; Sinclair v. Railroad, 133 Mo. 233; Morgan v. Railroad, 159

Mo. 262; Holwerson v. Railroad, 157 Mo. 216; Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497; Hook v. Railroad, 162 Mo. 569; Van Bach v. Railroad, 71 S. W. 358.  (2) At the close of the entire testimony the court below should have directed a verdict in favor of the defendant.  Authorities supra.  (3) The court gave erroneous instructions at the plaintiff's request.  Railroad v. Railroad, 118 Mo. 625; Robertson v. Railroad, 152 Mo. 382.  (4) The court refused proper instructions asked by defendant.  R. S. 1899, sec. 1105; Payne v. Railroad, 136 Mo. 562; Sinclair v. Railroad, 133 Mo. 233; Turner v. Railroad, 78 Mo. 578; Alcorn v. Railroad, 108 Mo. 90.

*Norton, Avery & Young* and *Barnett & Hostetter* for respondent.

(1) Instruction one given for plaintiff properly declared the law under the pleadings and the evidence. Hanlon v. Railroad, 104 Mo. 381; Smith v. Railroad, 53 Mo. App. 36; Dahlstrom v. Railroad, 108 Mo. 525; Reardon v. Railroad, 114 Mo. 384; Sullivan v. Railroad, 117 Mo. 214; Sinclair v. Railroad, 133 Mo. 233; Chamberlin v. Railroad, 133 Mo. 587; Williams v. Railroad, 96 Mo. 275; Lynch v. Railroad, 111 Mo. 607; Donahue v. Railroad, 91 Mo. 357; Schofield v. Railroad, 75 Mo. 434; Frick v. Railroad, 75 Mo. 595; Kelly v. Railroad, 75 Mo. 138; Mayher v. Railroad, 64 Mo. 267; Meyer v. Railroad, 59 Mo. 223; Dunkman v. Railroad, 95 Mo. 232; Powell v. Railroad, 59 Mo. App. 626; Kries v. Railroad, 131 Mo. 533; Guenther v. Railroad, 108 Mo. 18; Kelney v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262.  (2) Instruction 2 given at the instance of plaintiff properly declared the law.  Weller v. Railroad, 164 Mo. 180; Sullivan v. Railroad, 117 Mo. 214; Reardon v. Railroad, 114 Mo. 384.  (3) The court properly refused to give defendant instructions in the nature of a demurrer to the evidence.  Keller v. Rail-

road, 164 Mo. 180; Reardon v. Railroad, 114 Mo. 384. (4) The court did not err in the refusal of any or all of defendant's instructions which were refused: (a) They were too numerous and were unnecessary and liable to confuse the jury. State v. Frazier, 137 Mo. 317. (b) They embraced a repetition of principles already laid down. Crews v. Railroad, 19 Mo. App. 302. (c) The refusal was warranted by the very fact of their large number. Buck v. Railroad, 108 Mo. 179; Blanton v. Dold, 108 Mo. 64; Hickman v. Link, 116 Mo. 123; State v. Tomasitz, 144 Mo. 86.

VALLIANT, J.—The plaintiff, a girl between fifteen and sixteen years old, in company with her twin sister, was on her way to school walking along the defendant's railroad track, when her foot got fastened in the slats or bars of a cattle guard, and before she could extricate it a train of defendant, consisting of a locomotive, tender and caboose, came along and ran over her, inflicting very distressing injuries.

The theory of the plaintiff's case is that, notwithstanding the fact that it was the plaintiff's own act that put her in the position of danger, yet the servants of the defendant in charge of the train saw her in that position in time to have avoided the injury, if they had exercised ordinary care, but failed to do so.

The vital question in the case is, was there substantial evidence to sustain that theory?

The undisputed facts are as follows:

The father of the plaintiff lived on a farm two and a half miles west of Wentzville; his dwelling house was about thirty-five yards south of defendant's railroad track; the fence in front of his house, though about eighteen feet south of the line of defendant's right of way, was adopted by defendant by joining its right of way fence to it; the gate from the front yard opened on the right of way.

The railroad ran east and west in front of the

house. The schoolhouse, to which the children were going, was south of the railroad a half mile west of their father's house. There was a private road leading north from the Woods house across the railroad to the county road, which at that point was distant 356 feet from the railroad. The county road ran thence west, bearing south 939 feet, thence southwest 290 feet to the north line of the railroad right of way, thence along the right of way 1460 feet to another county road running north and south and crossing the railroad a half mile west of the Woods house. The schoolhouse fronted this county road. Where this road crosses the railroad there is a cattle guard on each side. The children could have reached the school house by going around by way of the county roads, but there was no road open to them from their father's house to the schoolhouse on the south side of the railroad. Their usual course to school and that of other children was, as they went on the morning in question, along the railroad track west to the county road, thence south about 250 feet to the schoolhouse.

The track from the Woods house to the cattle guard is slightly up grade, and, going west, it curves slightly toward the north. About half way between the private road in front of the Woods house and the cattle guard is a whistling post. This is 1320 feet from the cattle guard. One standing at the whistling post can see an object on the cattle guard. These girls were clad in red frocks and white sun bonnets. The engineer, defendant's witness, testified that when the whistling post came in view he sounded the whistle, and as he past the whistling post he saw the girls on the track, he was at his post on the right side of the cab looking up the track and kept his eyes on the girls until the accident occurred. The point of essential difference, however, between his testimony and that of the plaintiff's is, that he said that when he came in sight of the girls they had not yet reached the cattle guard

but were walking or running on the track towards it, whereas the plaintiff's testimony, as is contended, tends to show that her foot had already been caught in the cattle guard, she had already fallen and was in that condition when the engine came in sight and when the engineer first saw her. The plaintiff's testimony on that point is as follows:

The father of plaintiff testified that he was in the county road north of his house talking with his son and the witness Nat Walker when he heard the whistle of the train in the direction of Wentzville; he then thought of his children, looked up the road, and saw them, and holloed to them but they did not seem to hear, they were then about half way between the private crossing and the whistling post. He talked for a while with those young men, then walked to his granary some 200 yards distant, when he got to the gate he again looked towards his children and they were then at the cattle guard walking west, the train was then at the forty-six-mile post, about a mile east of his house, he could see the steam from the locomotive; the forty-seven-mile post was opposite the gate at his wood yard where he was standing. Seeing the children were as he thought out of danger he went on to the granary, 130 feet from the gate; in the granary he hung up some sacks, then came out, walked to his house about thirty yards and as he was going the train passed his house.

Nat Walker testified to the following effect:

On the morning of the accident he was driving a wagon loaded with grain to Wentzville; he met Mr. Woods in the public road north of his house; he stopped and talked with him some time, did not know how long; saw the girls walking up the track some distance, could not say how far. After parting with Mr. Woods witness drove on down towards Wentzville, at a steady gait, a walk. "Walked my team down there half a mile and met the train there."

Charles Oney, a boy sixteen years old, was on his

way to the same school, but coming towards the cattle guard from the opposite direction. He was walking east on the track and saw the girls coming west, saw Mary when she got her foot fastened and fell, and he ran to her assistance, but the train was on her before he got to her. He located the point from which he saw her fall by reference to a telephone pole, and stated that to be sure of the distance he went back afterwards and counted the rails, it was sixty rails, and after running towards her he was the distance of the length of thirty-two rails when the engine struck her. He testified that when she fell there was no train in sight, but that he could hear its rumbling, which he took to be east of the whistling post.

On cross-examination he was shown a written statement which had been prepared by an agent of the railroad company soon after the accident and was asked if he had signed it and if it was true, and he answered yes. In this paper it was stated that when he first saw the girls they were walking along the track and that as soon as the engineer whistled for the crossing they began to run towards the cattle guard and one passed over but the other got her foot fastened and she fell. "I know on account of the place I was in, this curve and cut, I could only see the engine when it was close to the crossing. The little girl was only fastened in the guard a very short time; couldn't say how many seconds before the engine ran over her."

Both the girls testified that they did not run, but were walking along as they usually did when Mary got her foot fastened and at that time there was no train in sight.

On cross-examination Mary was asked:

"Q. After you walked down the track, what happened to you when you got to the crossing? A. I got my foot hung in the cattle guard. Q. How long were you there? A. I don't know. Q. Where was the train at that time? A. I did not see it. Q. Was there

any train in sight? A. No, sir. Q. No train in sight, where was your sister? A. At the cattle guard. Q. What was she doing? A. Holding my hand. Q. Did you see the train at all that morning? A. No, sir. . . . Q. As you went across your left foot went down in the cattle guard? A. Yes, sir. Q. When your left foot went down between the cattle guard what did your sister do? A. She pulled my hand. Q. And just about that time the train struck you? A. Yes, sir. Q. How fast did you go as you walked down the track? A. In a walk. Q. When you got to the cattle guard your sister ran across ahead of you did she? A. No, sir. Q. Didn't you run? A. No, sir. Q. And when you got your foot caught your sister caught you by the hand and was pulling it and then the train struck you? A. Yes, sir. Q. Did you see the train at all? A. No, sir.''

And Lizzie was cross-examined thus:

''Q. Tell the jury what she was doing? A. Trying to get out. She was trying to pull her foot out. Q. What were you doing? A. Pulling her hand. Q. Now, where was the train, if you know, when Mary caught her foot and fell? A. I don't know. I was so scared. Q. You were so scared you did not see the train in sight? A. No, sir. Q. Did you look? A. Yes, sir. Q. Tell the jury where you looked? A. I looked east and west. Q. What did you see? A. Nothing. Q. You did not see anything, did you hear the train? A. I heard the noise of the train. Q. What kind of a noise was it? A. Rumbling. Q. How far could you see down the track? A. A long ways. To father's house. Q. How far is that from the crossing? A. About a mile. Q. As far as you could see what was down the track? A. Nothing. Q. When the train came and struck your sister, what did you do? A. Jumped off. It was right at me when I jumped off. . . . Q. While you were pulling her hand the train came up on you? A. Yes, sir. Q. You did not see the

train? A. No, sir. Q. You did not hear it whistle? A. No, sir. Q. You did not hear any sound at all? A. Only the noise of it. Q. You did not see the train until it got right on you? A. No, sir. Q. Just as Mary fell you turned back and caught her by the hand? A. Yes, sir. Q. And just as you pulled her the train ran on her and you had to dodge to get out of the way yourself? A. Yes, sir. Q. That was all done in an instant, wasn't it? A. Yes, sir.''

King, the conductor of the train, was called as a witness for plaintiff. He testified in effect as follows: The train consisted of engine, tender and caboose; the engine was equipped with air brakes, the caboose has a brake on each platform and one in the cupola. They were running on schedule time. Witness was familiar with the locality and knew the schoolhouse was there. The crew consisted of conductor, engineer, fireman and two brakemen. Witness was in the cupola of the caboose which was about four feet above the top of the tender, had a clear view of the track. ''The engineer whistled at the whistling post and right soon after that he shut off steam, which attracted my attention, and I ran my head out of the window to look and see what was the matter, and I seen what I first thought was cattle on the track half way between the private crossing and the public road crossing. I seen some one fall in the crossing and rise up and fall again, and we were then within three hundred feet of them, and I shouted to the brakeman to set the brake, and he grabbed hold of the brake and set it, and the engineer had the engine reversed and the air on, and it did not take long to do that. The engine stopped right on the crossing. The engine gave two or three little whistles after it passed the whistling post. First, I heard the whistle for the whistling post, and about that time I shouted to the brakeman to set the brake, and he whistled three or four times. After that he made the stop. He reversed the engine in making the stop and had the air set. That

is all he could do. There was nothing else that he could do that I know of. At the speed we were running I don't think he could have made a quicker stop than that. I don't think I have ever seen a quicker stop than that. When he started to make the stop he was more than half way between this whistling post and the crossing."

At the speed they were running, forty miles an hour, a stop within 300, 350 or 400 feet was a quick stop. "Q. Where were these young ladies when you saw them, how far east of the crossing? A. They were not very far, I don't think they was any further than the distance across this room, if that far, but they were both running." As to the engineer's call for brakes, the witness testified: "Q. Did he call for brakes? A. He did not call for brakes; he whistled two or three times, gave the alarm whistle. Q. How soon did he give the alarm whistle before he began to set the brakes, if you remember? A. It all happened about the same time. . . . Q. You say there was no call for brakes? A. If there was, I don't remember it. Q. You say there was no call for brakes? A. I do not remember whether he called for brakes; he whistled three or four times. Q. Where were you when you first saw the children? A. I was close to half way between the whistling post and the county crossing. Q. What is the difference between the danger signal and the call for brakes? A. When you call for brakes you whistle once. . . . Q. At what point between the whistling post and the crossing did the engineer start to stop the train? A. He was nearer the public crossing than he was the whistling post. I should judge he was between 300 and 400 feet from the public crossing. Q. How much over half way? A. I told you near 400 feet. Q. Where were you when you first saw the children? A. That was after we passed the whistling post. Q. How far? A. I don't remember; I seen him shut off steam after whistling and then is when I saw the girls. Q. What

was the purpose of shutting off steam? A. He had seen the people on the track I suppose. Q. Before he commenced to shut off the steam? A. He did right after but the speed he was going it did not take long. Q. That was directly after you passed the whistling post? A. Yes, sir. Q. How far had you passed the whistling post when the engineer shut off the steam? A. Two hundred and fifty or three hundred feet. . . . Q. Where did the train stop? A. The front wheels of the tender lacked about a foot of reaching the girl's foot on the rail. . . . Q. Now, Mr. King, you say the engineer did everything that he could to stop the train after he discovered these girls, is that right? A. I think he did. To the best of my belief he did. Q. You say he shut off steam about 250 feet west of the whistling post, how many feet was it then from where he shut off steam to the crossing where the accident occurred? A. That would make it over 1,000 feet. Q. Do they ever use sand when they try to stop? A. Yes, sir, when it is a bad rail. Q. Do you know whether they used sand that day or not? A. I don't remember. Q. What would be the effect towards stopping the train? A. It would assist some.. Q. Do you know whether they did everything they could do to stop the engine? A. I said he did everything in point of reversing the engine and setting the brakes. Q. As a railroad man I will ask you if he did everything that could be done? A. I don't know whether he sanded the rail or not. That would have assisted some."

The plaintiff's testimony tended to show that defendant's track in that vicinity had been used as a path by pedestrians, men and women and children, for many years, and that defendant's servants operating its trains had notice of it. The schoolhouse was used also as a church, and not only did the children walk along the track to school, but people going to church so used it, and also in going to and from Wentzville.

This train was on regular schedule time, the hour it usually passed every morning, and it was also the usual school hour when the children were in the habit of walking on the track.

There is no dispute as to the distressing character of the plaintiff's injuries.

The court refused the defendant's instruction looking to a nonsuit, and defendant excepted.

Mr. Stone, the engineer, a witness for defendant, gave the following account of the accident: He was at his post in the cab, the train was running forty or forty-five miles an hour. "The whistling post is about a quarter of a mile, I judge, from the crossing where the accident occurred. We were going west on that morning. As I was right at the whistling post or right close to it probably, the whistling post came in my view, I whistled for the crossing, and about the time I passed the whistling post, I did not miss it over fifty or sixty feet, I should judge, and as I say I was sitting there and looking up the track and I saw these two girls and could not judge from being behind them and from the motion of the engine just exactly how far they were from the crossing, but they were up in that neighborhood somewhere east of the crossing and we had just passed the whistling post probably three hundred feet, it might have been something like that, a short distance any way, I could not tell accurately, and I was watching the children, the girls coming up the track, and I seen they were going pretty close to the crossing, I was sitting there with my hand on the throttle and the other arm, my right arm, in the window, as is customary, and I reached up and partly eased off the steam and reached up and tooted the whistle two or three times, or three or four times probably, I don't remember how many, I didn't pull the whistle wide open or anything like that; it was evident to me they heard me, for they turned and looked down at me, and they started to run for the crossing or up that way, and I watched them

then, sit there and deliberately watched them to see whether they were going to try to cross or step off, and my opinion was they were going to step off inside of the fence there, and we got within probably five hundred feet I expect of the crossing, and the first one got over and she went over all right, and the second one seemed to take one step on the cattle guard; I was not noticing her feet particularly at that time, I was watching to see what she was going to do, and she fell down, and just at that time I shut off the steam and saw her raise up and fall down again and I jammed the brake on with my hand and put the lever into back motion and reached up and whistled for brakes and then I put my right hand on the sand lever and pulled it wide open and with my left hand I pulled the throttle wide open and that was the position I was in when I stopped on the crossing. To pull the reverse lever into back motion reverses the motion of the engine; instead of putting steam into the cylinder to go ahead, it puts steam into the cylinder in the opposite direction and pulls it backwards. That is the operation done by the throttle. When I took hold of the throttle lever and put steam in the cylinder it worked the engine backward. We use the brake valve to apply air; that is immediately in front of me. The reverse lever to reverse the motion of the engine is to the left of me. We move that so as to turn the wheels the other way. Probably it would take as long as you could count one, two, three to make those various movements. At that time it was between three and four hundred feet, not over four hundred feet on the outside, from where the girl had fallen. The engine stopped with the back drivers standing on the cattle guard and the front tank truck standing on the other, and the gangway exactly opposite the fence that comes down to the crossing at the cattle guard. The gangway is that place where the engineer goes up to the cab, with handles on each side

where the engineer and fireman go up and down, that is the division between engine and tender. The tender was east, and the main part of engine west of fence. It was equally divided. . . . When I first saw the children running they were within thirty or forty feet of cattle guard; at that time I was probably 150 feet from whistling post; the engine and children were separated about a quarter of a mile.

"When I passed whistling post about 100 feet I eased off steam to get it under control; kept a watchout for the children; saw they had not got off or made any attempt to get off. 'Q. They made no effort to get off the track? A. No, sir. Q. You kept on? A. Yes, sir. Q. What was the first thing you did after the girl fell in the cattle guard? A. As soon as she rose and fell again, which was about the same moment or second, I applied the air. Q. As soon as she rose and fell again? A. Yes, sir. Q. How many feet were you travelling a second? A. Over sixty feet. . . . Q. How far did this engine go over the girl, how many feet? A. Sixteen.' "

The witness said: "There is considerable difference between looking at an object from the engineer's position on moving train and standing still and looking at it. On a train you have got to determine at a glance; standing still you get a decided look; first saw cattle guard about whistling post; you could tell it was at crossing; could not determine exact location. At that distance if you see an object you can tell which side of the object a person is on, but it is difficult to say how close. Q. You did see these children notwithstanding the moving of the train? A. I did see them. Q. You knew they were on the track all the time? A. I knew they were there. Q. You did not see them make any effort to get off? A. They turned and looked at me and seen me coming. Q. They were within thirty or forty feet of the cattle guard? A. Yes, sir. Q. You knew the danger of the cattle guard? A. Yes, sir. Q. And

you knew the crossing was there? A. Yes, sir. Q. And you did not endeavor to slack up your train at all? A. No, sir."

There was other evidence for defendant tending to corroborate the statement of the engineer that the girls were running when he came in sight of them.

There was also evidence for the defendant of an expert character tending to show that taking the engineer's statement as correct the stop was made as soon as it could reasonably have been made.

There was a verdict for the plaintiff for $15,000 damages and judgment accordingly. Defendant appeals.

I. The main point on which the appellant relies is that there was no evidence on which the court was justified in submitting the case to the jury. The instructions are criticised, but the criticism is that there was no evidence on which to base them.

It must be conceded in the beginning that it was the plaintiff's own act that placed her in the position of peril. Walking along the track—especially over the cattle guard—was dangerous and the plaintiff's youth did not entirely exonerate her from the charge of negligence, though under the circumstances in view of the fact that it was the common custom of men, women and children in that vicinity to use the track as she was using it, her act could not be called reckless. But assuming that she was negligent and that her negligence put her in the position of peril, the question remains, did the servants of the defendant in charge of this train see her in this peril in time to have saved her from the injury by the exercise of ordinary care with the use of the means at hand? That is substantially the question which the instructions submitted to the jury and upon an affirmative answer to which they were directed to find for plaintiff.

Whilst ordinary care is all that the law requires of the defendant in such case, yet what constitutes ordi-

nary care is a question to be determined by the circumstances of the particular case. In 1 Thompson on Negligence, sec. 25, it is said: "The care, caution and diligence required by the law is always measured by the circumstances of the particular case, and the rule of admeasurement is, *the greater the hazard the greater the care required.*"

The circumstances by which we must measure the degree of care which the law demanded of the defendant in this particular case are that it was running its engine at the rate of forty or forty-five miles an hour over a part of its road where people were in the habit of walking, at the very hour when school children were to be expected on the track, that its engine when so running was so far beyond control that it could not be stopped within a less distance than 300 or 400 feet. The care that a man of ordinary skill and experience in the management of such a locomotive and of ordinary care and prudence would have been expected to exercise under those circumstances is the care the law required of the defendant's servants in this case.

Had the girl fallen before the train came in sight? If the facts testified to by the plaintiff's father, and Nat Walker, Charles Oney and the girls are true there can be no doubt of it. The father stated that he saw the children half way between the road in front of his house and the whistling post, they were walking west; he remained in conversation several minutes with the young men and then walked two hundred yards to the gate at his woodyard going to his granary; at the gate he heard the whistle at the forty-six mile post, which was a mile east, he then looked and his children were at the cattle guard walking west; being satisfied that they were out of danger he went on to the granary, hung up some sacks, and then walked to his house about thirty yards, and just then the train passed his house. That testimony is corroborated by Nat Walker who testified that after seeing the girls as their father said

he saw them, and after spending a short while in conversation with Mr. Woods, he drove on in a walk towards Wentzville and at a half mile down the road he met the train. If this testimony is true the girls not only had ample time to have reached the cattle guard before the train passed their father's house, but there was also time for the plaintiff to have become fastened and to have fallen and risen and fallen again several times, before the train came in sight. And this testimony corresponds with the facts stated by Charles Oney. He saw the plaintiff when she fell and ran to her assistance. He locates the point where he was when he saw her and measured the distance by counting the rails, sixty rails, 1800 feet. He said there was then no train in sight though he could hear the rumbling which he thought was east of the whistling post. As soon as he saw her fall he ran towards her, and had run the distance of the length of twenty-eight rails before the train struck her. He was impeded somewhat in running by having with him his six-year old nephew, whose hand he was holding. Yet he ran the length of twenty-eight rails, 840 feet, after he saw her fall before the train struck her. While that boy was running 840 feet, how far did the train run?

In addition to this, both the girls testified that when the plaintiff fell the train had not come in sight. We are not overlooking the fact that there was testimony on the part of the defendant tending to show that Mr. Woods, the father, had made a statement soon after the accident conflicting with what he said on the witness stand, and that Charles Oney had signed a paper written by the defendant's claim agent conflicting with what he said on the witness stand, and that on cross-examination the girls were asked by a leading question if it did not all happen in a second and they said, "Yes." But we are not going to invade the province of the jury. The jury had a right to discredit those witnesses if they thought they were unworthy of belief, and

they had a right to rely on what they said if they thought they were trustworthy.

But viewing the case from the standpoint of the testimony of the conductor and the engineer we see no cause to complain of the verdict.

There is no question in this case of what the engineer and conductor might have seen if they had been on the lookout, because they were on the lookout and did see all that there was to see.

The engineer said that he whistled at the whistling post, and as soon as he passed it he saw the children, then whistled two or three times again, and never lost sight of them until he struck the plaintiff. The conductor said that when he heard the several whistles he looked out and saw the children; they were within thirty or forty feet of the cattle guard and running towards it. The train was then, according to both men, at least a thousand feet from the cattle guard going at the rate of forty or forty-five miles an hour.

The engineer said he sat there deliberately watching the children to see if they were going to try to cross or step off, thought they would step off, but when he got within five hundred feet of them he saw them go on the cattle guard, one went safely over and the other fell, then she arose and fell again, and then he began to stop the train and did everything in his power to stop it.

According to the conductor there was no call by the whistle to set the brakes, but when he saw the plaintiff fall he shouted to the brakeman to set the brakes and the brakeman obeyed the order.

According to both these men the girls were only thirty or forty feet from the cattle guard and running towards it when they first saw them, and then they were distant at least one thousand feet. The engineer said he saw them and knew the danger into which they were running; that he watched them deliberately, but made no effort to stop the train or slacken the speed

until he was within three hundred or four hundred feet of them, yet they both said and their expert witnesses said, that three or four hundred feet was the shortest possible space in which the train under the given conditions could have been stopped.

Can it be said that they exercised ordinary care, the care that was reasonably to be expected of men of ordinary prudence and skill in handling that dangerous machine, knowing not only that school children were liable to be on the track, but that that was the very time when they were to be expected?

The engineer saw them, the red frocks and white sun bonnets of the twin sisters going towards the schoolhouse at that particular hour in the path that children for years had been going gave him notice of the fact that they were school girls, yet seeing them, as he said, running into what he knew was danger he made no effort to stop his train until he had come so near to them that it was barely possible to save them. He was going, he said, sixty feet or more in a second. He saw the child, then on the cattle guard, fall—what would that signify to an experienced railroad man, what would it signify even to one not so experienced? Yet when she fell the first time he made no effort to stop, he waited until she arose and fell again, then he did all in his power to stop and succeeded in so far that his engine ran only sixteen feet over her—if he had made his effort to stop a half second, even perhaps a quarter second, sooner, the injury would not have been done—that half second was consumed between the first fall and her rising and falling again; if he had made his effort when he saw the first fall, his own evidence indicates that he would have stopped at least sixteen feet short of where he did stop and the child would have been saved.

He said that when he saw the girls running towards the cattle guard and within thirty or forty feet of it, he was watching to see whether they would try to cross or get off; he thought they would get off, and acted

on that thought. Thus seeing the danger into which
they were apparently running, but it being doubtful in
his mind whether they would go on or get off, he re-
solved the doubt in favor of saving his running time
rather than of saving the children.

If the jury came to the conclusion, on the defend-
ant's own testimony, that, after the engineer saw and
realized the plaintiff's danger, he could, by the exercise
of ordinary care, have averted the accident with the
means at hand, yet failed to do so, we are not prepared
to say that their verdict was unwarranted. But we
rest the case on the proposition that there was sub-
stantial evidence on the part of the plaintiff to justify
the submission of the case to the jury on the hypothesis
that the plaintiff's foot had become fastened in the
cattle guard and she had fallen before the train came
in sight and that the defendant's servants saw her in
peril and could have stopped the train in time to have
averted the accident but neglected to do so.

II. Appellant complains of the giving of the in-
structions for the plaintiff and the refusing of some of
those asked by defendant.

The instructions given for the plaintiff were as fol-
lows:

"1. The court instructs the jury that if you believe
from the evidence that Mary Woods at the time that
she was struck and injured by defendant's engine and
cars, operated by its agents, if you believe from the
evidence that she was so struck and injured, was on
a cattle guard at or near a public road crossing for
the accommodation of the public passing over defend-
ant's road, and that the track was in such a condition
for 1200 feet east from the point of the collision that
defendant's agents and servants operating its engine
and cars could have seen plaintiff on said track
between said points; that for about ten years prior
thereto and at about the time of the said striking of
said Mary Woods, with the knowledge of defendant

that part of defendant's railroad track had been and was frequently used by pedestrians in going to and from Point Prairie school house from the east, and that said Point Prairie school house was near said public road crossing and near defendant's track, and that for about ten years prior thereto school children attending said school at said school house had been in the habit of using defendant's said track to walk thereon and many children had been accustomed to use said crossing at about the hour of the day that the injury is shown by the evidence to have been inflicted on plaintiff, and that defendant had knowledge of such use of its track and said crossing, and that said Mary Woods, while travelling upon defendant's track at or near said public road crossing, became fastened in said cattle guard so that she could not extricate herself, and became in imminent peril of being struck by defendant's train, and defendant's employees in charge of said train became aware of her perilous position at said cattle guard in time to have enabled them by the exercise of ordinary care to have stopped said train and to have averted the injury to plaintiff, or if the jury believe from the evidence that said employees in charge of said train by the exercise of ordinary care could have become aware of her perilous position, at said cattle guard, if the evidence shows she was in a perilous position, in time to have stopped said train and to have averted said injury to plaintiff, and that they failed to exercise such care to stop said train, and that by reason of such failure to exercise such ordinary care the said train was not stopped and said Mary Woods was struck and injured, then the jury must find for the plaintiff, though the jury may believe that Mary Woods was guilty of negligence in going up and traveling on defendant's track. And by ordinary care, as used in this instruction, is meant such care as an ordinary, careful and prudent person or persons would exercise under the same or similar circumstances.

"2. The court instructs the jury that if you find and believe from the evidence in the cause that the plaintiff while traveling on defendant's track on October 11, 1899, became fastened in defendant's cattle guard, by having her foot caught therein, and fell on said cattle guard, and that her position was then a perilous one, and that defendant's engineer in charge of its engine saw her fall and became aware of her perilous position, then it became and was the duty of said engineer immediately and at once upon seeing her fall and becoming aware of her said perilous position, to attempt to stop the train by the use of all the means and appliances at hand consistent with safety to himself, the train and those on board of the train. And if the jury further believe from the evidence that the engineer after he saw plaintiff fall on said cattle guard, if he did so see, and became aware of her perilous position, if he did so become aware thereof, did not immediately and at once use all the means and appliances at hand to attempt to stop the train, consistent with the safety of himself, his train and those on board the train, and that plaintiff was run over and injured by reason of the failure of said engineer to immediately and at once use all such means and appliances at hand in the manner aforesaid to attempt to stop said train, then the verdict must be for the plaintiff.

"3. The jury are further instructed that if you find for the plaintiff, you may, in assessing the amount of her damages, take into consideration her age, at the time she received her injury, the extent and permanency of her injury, if any, also her pain, suffering and anguish, if any, resulting from such injuries as shown by the evidence in the case; in all, not to exceed the sum of twenty-five thousand dollars."

Those given for the defendant were as follows:

"The court instructs the jury that before the plaintiff can recover in this action she must establish by the greater weight of the evidence in the case that

while she was upon the defendant's track and going over the cattle guard she caught her foot therein at such a time as the engineer in charge of the engine could in the exercise of ordinary care have discovered her peril, or that he did discover it in time to have stopped the engine in time to have prevented the same from running upon and into her. If the plaintiff by her testimony has not established these facts, then you will return a verdict for the defendant.

"If the jury find from the evidence in this case that at the time and place here in question, the engineer then and there in charge of defendant's west-bound train, sounded the whistle on said engine while passing the whistling post on defendant's railroad track, and that thereafter, seeing the plaintiff and her sister walking along said track between the rails thereof, west of said whistling post, and east of a public crossing thereon, sounded an alarm whistle on said engine as a warning to said girls; that thereafter, instead of stepping off of said track, said girls ran along said track in front of said engine and then attempted to cross over a cattle guard in said track on the east side of said crossing before said engine could get there; that while attempting to cross said cattle guard as aforesaid, plaintiff caught her foot between the bars of said guard and fell; that as soon as the engineer, then and there in charge of said engine, saw plaintiff fall, if he did see her fall, he endeavored by every means in his power, and by the use of all the appliances at his command, to stop said engine in time to avoid striking the plaintiff, but was unable to do so, because it was then impossible to stop said engine in the distance then intervening between said engine and the plaintiff, then they are instructed that the plaintiff is not entitled to recover in this action, and your verdict must be for the defendant.

"The court instructs the jury that all the evidence as to persons walking upon the track between the school

house and Woods house prior to August 1, 1889, is withdrawn from the jury and you will not consider the same.''

Defendant's instructions refused were as follows:

''1.   The court instructs the jury that under the pleadings and all the evidence in this case, the plaintiff is not entitled to recover.

''2.   If the jury find from the evidence in this case that the place where plaintiff was walking on defendant's railroad track, and between the rails thereof, and was injured at the time in question, was not at the crossing of any public highway, nor within the limits of any city or town, and was at a place where said railroad track was fenced, then they are instructed that she had no right to so walk upon said track at said time and place, and that she was guilty of negligence or want of care and was a trespasser in so doing.

''2a.   The court instructs the jury that it was negligence on the part of the plaintiff Mary Woods to go upon defendant's track and continue walking upon the same, and if you believe that the whistle was sounded at the whistling post and an alarm was given to warn her of the approaching train and she still continued upon the track and went upon the cattle guard and there caught her foot between the bars of the same, and the engineer, in the exercise of due care on his part, upon discovering that she was fast in the cattle guard, did what was in his power to stop the train to prevent its running upon her, but failed so to do, but the plaintiff was thereafter run upon and injured, she cannot recover and you will return a verdict for the defendant.

''3.   If the jury find from the evidence in this case that at the time in question the plaintiff was about 15 years of age, then they are instructed that she was not in law an infant, and that she was then and still is responsible the same as an older person would be in this action for her negligence, or want of care, which resulted in the injury here sued for.

"4. If the jury find from the evidence in this case that at the time and place in question the plaintiff walked on the railroad track of defendant between the rails thereof, not at the crossing of any public highway, or within the limits of any town or city, without looking or listening for the approach of trains on said track, or without attempting to step off of said track to one side thereof, to a place of safety if said approaching train was either seen or heard by her, until she was overtaken, struck and injured by one of said trains, then they are instructed that plaintiff is not entitled to recover in this action, and your verdict must be for the defendant, even though they should further find from said evidence that prior to said time the plaintiff and others had been in the habit of walking on said tracks at said place.

"4a. The court instructs the jury that persons could not acquire any right upon defendant's right of way nor any right to use the same as a highway, and under the law any persons walking upon said track were trespassers and the fact that others did so does not excuse the plaintiff from walking on the track or make it any the less negligent on her part. And although you may find that many persons walked upon the track and that plaintiff habitually did so in going to and from school, yet that will not excuse her from the consequences of her own negligence, and if you find that the engineer upon discovering the plaintiff's perilous situation made use of the means within his power to stop the train but failed to stop it in time to prevent its running upon plaintiff and injuring her, then your verdict will be for the defendant.

"5a. The court instructs the jury that you will not regard the testimony of the next friend, Woods, as to the speed of the train when he saw it the morning of and just prior to the accident, and the same is withdrawn from your consideration.

"6. Even though the jury should find from the evidence in this case that the engineer then and there in charge of defendant's engine at the time and place here in question could have stopped said engine before striking the plaintiff, when said engineer first saw the plaintiff walking on defendant's track ahead of said engine, if he did so see them, yet they are instructed that said engineer in such case had the right to presume that plaintiff would get off of said track in time to avoid being overtaken, or struck by said engine, and should rightfully proceed with his engine without stopping or trying to stop it or check its speed, and that thereafter in order to render the defendant liable in this action, it must appear either that said engineer knew of or in the exercise of ordinary care could have known of plaintiff's peril at least long enough before the injury to have enabled said engineer to have formed an intelligent opinion as to an injury to plaintiff might have been avoided, and applied the necessary means in order to prevent or avoid it, and if they find from the evidence in this case that said engineer did not know that plaintiff's foot was fastened in the cattle guard if it was so fastened, in time to determine what was best to be done by him in order to save her, or in time to use every means then in his power to stop his engine, and avoid striking her, then your verdict must be for the defendant.

"6a. The court instructs the jury that the plaintiff under the law had no right to use the railroad track of the defendant in going to and from school, and you are instructed that when she did so use it she was a trespasser thereon. And you are further instructed that it was not the duty of defendant's engineer to make any effort to check or stop the train when he saw the plaintiff walking along the track ahead of his engine, but that it was her duty not only to keep a lookout for the approach of a train, but it was her duty to get out of the way of the train when she saw its

approach or heard its approach or by the exercise of care could have known of its approach. And you are further instructed that the engineer had the right to presume that the plaintiff would get off of the track at any moment, and this he had the right to presume and to act upon such presumption until he actually saw her fastened in the cattle guard. Now if you find and believe from all the facts and circumstances given in evidence in the case that the engineer saw the plaintiff on the track and his engine was at or near the whistling post and that she continued along the same and that when he saw that she had became fastened in the cattle guard he used his best judgment and in the exercise of due care applied immediately all the means within his power to stop the train to prevent the accident after he discovered her position, then you should find for the defendant even though you may believe that said engineer was mistaken when her peril began and but for such mistaken judgment might have stopped the train sooner than he did and thus have prevented the injury.

"7. Although the jury may find from the evidence in this case that at the time and place in question, defendant's engineer then in charge of its engine did not stop it or check its speed when he first saw plaintiff walking on defendant's track ahead of said engine, yet they are instructed that said engineer then had the right to presume that plaintiff would get off of the track as said engine approached her, and if after seeing her fall in the cattle guard, said engineer acted upon his judgment and did what he judged was most likely to save the girl, his omission to use any other means of averting injury to plaintiff was not negligence, for which the plaintiff can recover in this action.

"7a. The court instructs the jury that there is no evidence in this case that there was any defective machinery about the engine or that any part of it failed to properly work or that the engineer failed to make

use of any means within his power to stop the engine after discovering the peril of the plaintiff.

"8. The court instructs the jury that the defendant was not required by law to sound the whistle on its engine and ring the bell before reaching the crossing at the time and place in question, and if they find from the evidence in this case that either the whistle was sounded or the bell was rung on said engine before reaching said crossing, then they are instructed that the defendant is not liable in this action on account of failure to give signals before reaching said crossing as required by law.

"9. Although the jury may find from the evidence in this case that the plaintiff's foot was fastened in the cattle guard at the time and place in question, when the engine which afterwards struck and injured the plaintiff was at the whistling post, one-fourth of a mile east of said crossing, yet if they further find from said evidence that the engineer in charge of said engine could not see the cattle guard from said whistling post, and that when said engineer did see that plaintiff's foot was fastened in said cattle guard, he used all the appliances at his command in order to stop said engine and avert said injury and was unable to stop said engine, and save the plaintiff, because the distance was too short, or the time too limited, or for either or both reasons, then they are instructed that the plaintiff is not entitled to recover in this action, and your verdict must be for the defendant.

"10. If the jury find from the evidence in this case that when the engineer in charge of defendant's engine at the time and place in question reached the first whistling post on defendant's track east of the crossing, where plaintiff was injured, that said engineer could see the plaintiff at or near the cattle guard, where the plaintiff was afterwards struck and injured, by said engine, yet if they further find from said evidence that at said time and place said engineer could not tell

whether the plaintiff was fastened in said cattle guard or not, then they are instructed that plaintiff is not entitled to recover in this case on account of the failure of the engineer, if he did so fail, to stop said engine in time to avoid striking and injuring said plaintiff at the time plaintiff was first seen by said engineer, if she was so seen by him, at or near said cattle guard.

"11. The court declares the law to be that under the pleadings and the evidence in this case this court has no jurisdiction to hear or determine this controversy.

"12. The jury are instructed that under the Constitution and laws of Missouri now in force if a verdict is agreed upon in this case, such verdict must be the unanimous finding of the jury.

"To which ruling and action of the court in refusing its said instructions, defendant, by its counsel, duly excepted at the time and saved its exceptions."

The plaintiff's case by her pleading, proof and instructions is based on the law as expressed by this court through BRACE, J., in Kellny v. Railroad, 101 Mo. l. c. 74, as follows:

"We know of but one exception to the rule that where an injury is the product of the joint concurring acts of negligence of both plaintiff and defendant the plaintiff cannot recover, and that is an exception made, on grounds of public policy and in the interest of humanity, to prevent and restrain, as far as may be, a willful, reckless or wanton disregard of human life or limb, or property, under any circumstances, and that is when the injury was produced by the concurrent negligent acts of both plaintiff and defendant, yet if the defendant, before the injury, discovered or by the exercise of ordinary care might have discovered the perilous situation in which the plaintiff was placed, by the concurring negligence of both parties, and neglected to use the means at his command to prevent the

injury, then his plea of plaintiff's contributory negligence shall not avail him. This exception proceeds not upon the theory that the defendant has been guilty of another and independent act of negligence which is the sole cause of the injury and which must be charged as a separate and independent cause of action, but upon the ground that the negligence he was then in the very act of perpetrating was characterized by such recklessness, wilfulness or wantonness as that he shall not be heard to say that the plaintiff was also guilty of contributory negligence.''

The case concedes the plaintiff's negligence and asks to recover only on the ground that the defendant's servants saw, or should have seen, her peril, and after becoming aware of it failed to avert the injury which they could have done with the means at hand if they had used ordinary care. That is the purport of the plaintiff's instructions, and the jury were authorized to give her a verdict only on satisfactory proof of such case. And the substance of the instructions given for the defendant was that the verdict should be for the defendant unless such case was proven; that if instead of the conditions asserted by the plaintiff the facts were that the girls were walking or running on the track when the train came in sight, the engineer gave the whistle of alarm which they disregarded and instead of stepping off as they could have done continued to run in front of the coming engine and attempted to cross the cattle guard and plaintiff got her foot caught when the train was too close to be stopped in time although the engineer did his best to do so, then the verdict must be for the defendant.

Those instructions covered the whole case; all the rest asked were either repetition or inappropriate or erroneous.

The questions offered for the consideration of the jury in the refused instructions, as to whether the plaintiff had a right to use the track for a foot path,

whether she was as "responsible the same as an older person would be in this action for her negligence," whether she was negligent in not listening for the approach of the train or negligent in any other respect, were questions not in the case; if she was not entitled to recover notwithstanding her negligence she was not entitled to recover at all.

If by refused instructions 6, 6a and 7 the defendant intended to substitute as the standard of care that which in the best judgment of its engineer should have been done in the emergency for that which a man of reasonable skill and experience and of ordinary care and prudence in his place would have done, it did not state the correct rule of law; if it meant that the engineer was expected to exercise only the degree of care that was to be expected of a man of reasonable skill and experience and of ordinary prudence in his place, then the point was sufficiently covered and more unequivocally expressed in the instructions given.

Refused instruction 7a seeks to call the attention of the jury to the fact that there was no evidence that there was any defect in the machinery as if the plaintiff had failed on that point, whereas there was no such point in the case; then for the balance of the instruction, "there was no evidence that the engineer failed to make use of any means within his power to stop the engine after discovering the peril of the plaintiff," it was not justified by the evidence.

Refused instruction 8 seeks to bring into question the duty of defendant in reference to sounding the whistle or ringing the bell of its engine, which is not in question; there is no complaint that the whistle was not sounded or that the bell was not rung.

Refused instructions 9 and 10, in so far as they correctly bear on the case, contain nothing that is not covered by the instructions given.

No good results in the trial of a cause by a multitude of instructions which only ring the changes on all

the phases of the case reiterating the same propositions.

As to refused instruction 11, the learned counsel for appellant have not favored us with their views of it, and we do not see its bearing.

We discover no error in the record.

The judgment is affirmed.

*Brace, C. J., Gantt* and *Lamm, JJ.,* concur; *Burgess* and *Fox, JJ.,* concur in all except that they are of the opinion the judgment ought to be reversed and the cause remanded because of the refusal of the sixth instruction asked by the defendant; *Marshall, J.,* not sitting.